is 223283 United States v. Joshua Campbell. Good morning Mr. Hillis. Hi Judge Rupner. Judge Hamilton, Judge Jackson, Acumi, Counsel. My name is Daniel Hillis. I'm with the Federal Public Defender's Office and I represent Joshua Campbell on this challenge of the District Court's suppression decision. I'd like to begin with a paraphrase of Minnesota v. Murphy. This is at page 435 from the opinion and it says that if the state expressly or impliedly asserts that invocation of Fifth Amendment privilege against self-incrimination would lead to revocation, it creates a classic penalty situation that excuses the defendant's failure to invoke and makes his compelled statements inadmissible. And then of course there's case law that says the derivative evidence from those statements would also be inadmissible. Relevant here, we have at Record 10, Exhibit 1, a parole condition statement that required my client Mr. Campbell to respond to any and all communications from the probation officer or its designated authorities to answer their questions and also that if he did not be subject to immediate revocation of his parole. So in our view, the distinguishing difference between this case and those government sites to say there is not a classic penalty situation is the existence of the language that's at paragraph 10 of the parole agreement and then the special condition that does say that you have to respond or you are subject to immediate revocation. There's nothing in there that allows my client to remain silent were he to do so, he would have been subject to immediate revocation. So with that... Mr. Hillis, I guess I'm troubled by various aspects of this case. One of them is trying to distinguish between a reasonable fear of revocation if the parolee invokes the privilege versus a plausible fear, I think is the phrase in the case law, which sounds like a remarkably subtle distinction to me and one that is intensely factual and quite impractical to apply. Those nuances aren't lost on me, Judge, but I will say that... I didn't think they would be. The difference, of course, we can point to immediately between this case and others is that there's no requirement here that he only be truthful. He has to answer... He has to respond, right? Right, which I don't think, incidentally, we'd be here arguing if he could answer untruthfully or hold back information that he'd be in compliance. So some of those niceties or those concerns that are illustrated in Minnesota versus Murphy are just different here by the language, but also, Judge, undergirding the concern about some of the particular facts of the case, if we were to look at those, we'd be struck by the difference between Minnesota versus Murphy and this case, which I think is at page 437 in Minnesota versus Murphy, and that would be that there they said that the state said they would never revoke anybody, nor could they, if they refused to answer, and in this case, at appendix pages 24 and 25, on direct examination by the AUSA, the witness, who's the probation officer, Smith, said that he has revoked somebody, and of course, my client had been revoked by Mr. Smith as well, by Officer Smith as well, but he said that just days ago, I think it was, four days ago is my recollection, that he had revoked somebody or sought to revoke somebody for not answering a question. So that is highly pertinent, then, if the facts of the particular circumstances, the interactions between the probation officer and the defendant come into play, that would also counsel in favor of finding there is a classic penalty situation, that these are not just implausible fears, these are actual experiences. Mr. Hillis, Campbell merely had to respond to any and all communication. You know, one potential response could be, I'm invoking my rights under the Fifth Amendment, and I refuse to answer that inquiry. No one ever, as far as I could see, you help me out if I'm wrong, as you always do, no one ever explicitly or implicitly threatened Campbell with revocation of his parole for refusing to answer. Campbell refused to provide his computer password several times, because as he stated, he feared new charges. He didn't fear, he didn't, not because he had been threatened with a parole revocation. And look, the officers merely asked whether there was anything that would violate the conditions of his parole. It seems to me pretty uncontroversial that parole officers are permitted to ask a parolee if he is compliant with his conditions of his parole. And of course, we all know that based on that question, Campbell does reveal or did reveal that he had these sex toys, and eventually that he had a computer. And it seems to me that both revelations would open the door for further searches. There's a lot to unpack there, Judge, so if I miss anything, please redirect me. But again, first of all, the request of is there anything here in violation is asking him to admit conduct. So this is not were you still residing here or anything that is more biographical in the case law that allows for that sort of thing. We're asking for somebody expressly to admit that they are in violation of the condition of probation or parole. And it's really more of a substantive violation of criminal law as opposed to a technical concern about where do you reside and are you still working. Now, recall the purpose of the visit was to see if he was working. It took four officers to come there and ascertain whether he was working apparently. But again, let's put that to the side. Was he compelled? I'd say absolutely yes. We have, again, the language from the agreement, which is the Record 10, Exhibit 1, Paragraph 10, and the special condition. This is different from the cases where somebody would be able to invoke because the language here says if you don't respond, you are subject to immediate revocation of probation and parole. And of course, again, we have the officer who testified that he had revoked people. So this is a very different set of circumstances with different language, different facts than any of the cases the government cites. Look, he signed this parole agreement provision. Yes. He signed the whole thing, of course. And the provision that's key, I guess, obviously, is that he agreed to report to his supervising officer as instructed and to respond to any and all communications from any authorized employee of the Department of Corrections. And another part of that agreement, as I recall, said something like, you know, any, I don't know, acts or something in violation of the term of parole will subject me to be taken into immediate custody. He signed it. Okay? Right. Okay. Right. And therefore, he knew about the express provisions that would lead to his revocation. So he did not have the ability to hold back. This could be different if there was language in the parole agreement that says that you retain your right to invoke your Fifth Amendment right against self-incrimination. We include that language commonly now in supervised release conditions because of the same concern. So this was an easily avoidable problem. And here the officers took advantage, knew that they were prompting, incriminating statements. If I may move briefly to the circumstances, because this is a two-part inquiry, we need to establish that there was the self-infectuating invocation and also whether he was in custody. And I'll just rattle off quickly. This is an unannounced visit. So that's unlike Cranley. We have four officers who are armed. They show up. They are taking over the fourth, excuse me, the bedroom, two of them. It's a small bedroom. I don't know if we call it Lilliputian in size, like in Slate. But the officers are standing there next to my client, roused naked from his bed, another one in the hallway, preventing him any egress. So he is not free to leave. They don't tell them that he's free to leave. They've effectively taken control of the room. These officers are like, you know, University of Michigan offensive lineman-sized guys. They're not small individuals. They're imposing. And the totality of the circumstances would inform a reasonable person that they are not at liberty to terminate the interrogation. So I don't think that there's any doubt under the circumstances if we look at the totality of the circumstances. But there is one thing that I need to correct from my brief. And I said that the district court did not discuss about the interplay between the probation officer and my client. So I went back and I reread Minnesota v. Murphy. And they considered that to be a factor that favored the government, that you have these types of interactions. And so I will chalk that up to the era that it's written, that we might have had a different view of interactions between probation officers and defendants. But I accept what Minnesota v. Murphy says. I just have doubts about the wisdom of that sort of thing, where we could say that these officers, in asking the questions, would not be imposing intimidating figures when they have, in fact, one of them previously revoked my client and testified they've revoked others. I don't think that we can say that the circumstances between the interactions wouldn't be compulsive or compulsory. I think that they are imposing and they are not helpful. Mr. Hillis, with the indulgence of my colleagues, and I'm sure you'll have some rebuttal time, but I'd like to ask you about the relationship between Fourth and Fifth Amendment rights here. This provision says they can do a search with reasonable cause to believe that he may be violating parole. I'm pretty sure that a complete waiver would also be constitutional. So a parolee has virtually no Fourth Amendment rights. That can be waived as a condition. Why should the Fifth be any different? That's something I thought a little bit about prior to today, Judge, and I'll say this. The distinction between the two protections is where I would begin. So the Fourth Amendment, you never have an exclusive protection. The Fifth Amendment, there's no reasonableness report like there is in the Fourth Amendment. So conceptually, they are different in that regard. You don't have an unqualified right in the sense that you do for the Fifth Amendment as you do for the Fourth. And so I believe it's Cranley that discusses this. Judge Posner, writing for the court, explains some of the differences when he talked about Knight and Sampson, those cases that said that you could fully waive the Fourth Amendment. But I think that it also said we have to respect, though, that Minnesota v. Murphy has not said the same thing about the Fifth Amendment. And the court didn't make the distinction that I just made, but I think it's a worthy one because if you can take away somebody's upon conviction, there are more limited protections of the Fourth Amendment. That's a very different creature than now allowing compulsory incrimination by an individual just by virtue of a criminal conviction. We still require officers to give Miranda warnings under most circumstances under arrest. If my client were arrested, I don't think that we'd say you don't have to Mirandize that person. He would still be subject to his Fifth Amendment protections. I haven't time to do a deeper dive in that, but I hope I've been responsive. Thank you. And, of course, you will get your rebuttal time. May it please the court. Good morning, Your Honors. Eli Temkin for the United States. This court should affirm the district court's order denying suppression. It's helpful in this case first to zoom out and then to zoom in. Ultimately, what Mr. Campbell is saying here is that the parole officers weren't allowed to ask him whether he had anything that violated the terms of his parole. The baseline here is that you have a Fifth Amendment right to silence, but that right is not self-executing. If you want to take advantage of that right, you need to invoke it. Law enforcement officers in the state can ask you incriminating questions, and they're allowed to do that. You need to invoke the Fifth Amendment right if you want to take advantage of it. And so with that, there can be a general obligation to show up and answer questions. We know that from cases like Minnesota v. Murphy and from this court's case in United States v. Cranley. You can be obligated to show up and answer questions. That's not enough to make the right self-executing. For the right to be self-executing, the state has to take some extra impermissible step. That's the language from Minnesota v. Murphy. They have to threaten that if you invoke your right, you're going to receive a penalty. Why isn't it reasonable to take paragraph 10 and the violation language of the agreement and the history of Officer Smith here to say this threat was sufficiently clear? Yes, Your Honor. I'll start with the language, and then I'll talk about the previous instance. The language here says, I'm going to quote it, Mr. Campbell was required to, I quote, report to his supervising officer as instructed and to respond to any and all communications from any authorized employee of the Department of Correction. So that imposes a requirement to report and to respond to any and all communication. That fits well within what the Supreme Court has approved in Minnesota v. Murphy and what this court approved in United States v. Cranley. In Minnesota v. Murphy, the probationer was required to report to his probation officer as directed and be truthful with the probation officer in all matters. In Cranley, the language was the probationer was required to report to his probation officer as directed for scheduled or unscheduled meetings and to provide true and correct information verbally and in writing in response to inquiries. And that's on page 618, 350 F. 3rd, 618. The language here fits squarely within what those cases allow. Those impose this kind of general requirement to show up and in Cranley at least to respond to provide true and correct information. Those don't take the extra impermissible step that Minnesota v. Murphy theorized. And here it fits squarely. It largely tracks the language of those two. And so if it was okay there, it's okay here under Supreme Court precedent and this court's precedent. Do we know whether Mr. Campbell was in fact violating the employment conditions of his parole agreement and whether the officers figured that out during their visit? I have been wondering about. I do not recall testimony saying that they resolved it. There was testimony that the officers had some indication that he was not fulfilling the employment requirement. I don't recall off the top of my head whether there was a finding, whether they resolved that. And exactly how much time elapsed between when the officers entered the apartment and when Campbell admitted that he had prohibited items in his nightstand? The district court found at most 15 to 20 minutes had passed for the entire first part of the interaction, which is that issue here. I don't believe there was a finding as to when, within that range, he, Mr. Campbell, directed the officers to his collection of sex toys, but it was... Right. And then there was another 15 to 20 minutes after, I guess, Wheeler went out to see about a warrant, right? Correct. Later on, there was another 15 to 20 minutes. Right, right. Okay. Yeah. Okay. To Judge Hamilton's question about the previous instance in which Officer Smith had a supervisee who refused to answer. First thing on that point, the record shows that Officer Smith said he violated the supervisee. In that circumstance, it doesn't say that supervision was revoked in that case. That's a pretty subtle nuance in terms of trying to decide on the spot, do I answer this question or not? It matters, though, Your Honor, because violations happen. A revocation is different. A revocation is serious. You're in prison then. Violations... The only things that lead to revocation are violations. Correct, but they don't automatically lead to revocation. And in this case, Campbell testified there was a previous instance in which one of the officers was aware of him violating the conditions of his release, and he wasn't revoked in that instance because he told the officer about it, he was forthcoming about it. So it doesn't automatically turn into a revocation. As soon as he admitted that he had prohibited items in his nightstand, was that information alone sufficient to immediately arrest him and subject the rest of the room to a search pursuant to the parole agreement? That would have been enough to trigger the search of the entire room, yes, under the parole agreement. So that's really the only step that's at issue. Once they knew about the existence of the sex toys, they could conduct the search. It's also important here that Mr. Campbell knew he could refuse to answer a question if he thought it would incriminate him, if he wanted to refuse to answer, and he did that. And that's something that the Supreme Court noted in Minnesota v. Murphy, that if there's evidence that in that case the probationer, there was evidence the probationer refused to answer a question at one point, and that supported finding that an answer wasn't compelled. Are you referring here to the password issue or something else? In this case? Yes. Yeah, his computer password. He refused to provide it, I believe on multiple occasions, because he thought he was afraid of picking up a new charge. He refused to provide it until they compelled him to by telling him, you know, we're going to search it anyway, we're going to get it anyway, and then he provided it. Does that undermine your argument that he really understands the contours and the scope of his ability to not answer questions? So the ultimate information, the computer password, that's not what's at issue here. I understand that. Do you understand the question I'm asking? I believe so. I'll try to answer. Does it matter that he was basically assuming he was compelled to provide his computer password, that he resisted providing that information a few times, and so he was asked? And then his resistance was overcome by the officer's responses to his resistance. So does that affect your argument at the outset that here's a guy who knows that he has a Fifth Amendment right? We must assume from the fact that he refused to provide his password that he knows he has a Fifth Amendment right, so you all shouldn't be concerned about anything. No, it doesn't affect the argument because at that point it was basically out the window. At that point, you know, the computer was subject to search under the terms of his parole agreement, and that's what was going to happen. So once he knew that, he gave them the password, and that's fine. But a step before that, he said, I don't want to answer. I don't want to pick up a new charge. And so later on he found out that the computer was going to be searched either way, and that was legitimate. But before that, he still believed that he had the Fifth Amendment right available to invoke, and he knew how to do it. If I could just quickly move on to the custody piece, unless there are any other questions. Do you agree he was in custody after he was cuffed? He has a much stronger argument, at least, after he was cuffed. I'll take that as a yes. So on the custody piece, yeah, he was not cuffed at this time. There are two pieces of the custody test. Someone has to be arrested or subject to a restraint of movement to the extent of formal arrest, and there has to be a coercive shock. And we know that being in prison, for example, by itself is not enough to establish custody for Miranda purposes. Here, this was a standard visit. I could run through the factors, but we addressed them in our brief. I'd be happy to speak more about any of them if there are questions. Hearing none, do you want to just wrap up? Hearing none, the government would ask that this court affirm. Thank you, Your Honors. Thank you, Mr. Duncan. Mr. Hillis? Ruling for the government would, in my view, jeopardize the ongoing vitality of Minnesota v. Murphy, something that was recognized as a legitimate protection still in Cranley, although they found Minnesota Murphy didn't apply in that circumstance. We have language here that distinguishes this case from Cranley, from Minnesota v. Murphy, and so the extra impermissible step, Judge Hamilton, is the language of this parole conditions sheet. I also worry that we are, were we to accept the government's position and affirm, we're going to create a circuit split relative to Sucheo, the Ninth Circuit case that we cite in our brief where they did suppress the rifle or the firearm that the individual disclosed as part of the intake from the probation office inquiry where the person, when asked if he has a firearm, said, yes, I have one in my home, and then the government took that evidence, prosecuted him in the Ninth Circuit, suppressed the evidence, and said that you can't do this. This is a similar circumstance to that. I don't see a lot of daylight between these cases. Knowing that an officer can seek revocation for any violation will compel a reasonable person to answer, and Judge Jackson-Aquimi, I think you're exactly right. The facts show here that he didn't understand that he could resist, because otherwise he wouldn't have ultimately caved in to the pressures of the inquiries of the two parole officers. So we think that under the express language of this condition, which does differ from other cases, we have a self-actuating invocation. We think that Sucheo supports our claim beyond Minnesota v. Murphy, and we think that all of the factors that we've delineated in our brief and we've touched on here today do support that my client was in custody such that there is an in-custody interrogation, that my client was not free to leave, and it was fruit of the poisonous tree, once they got him to make the admissions that he did that allowed them to get the search warrant and find the evidence that led to the successful prosecution conviction. Just very briefly, do we know whether Mr. Campbell knew of the prior instance of Officer Smith violating someone for refusing to answer a question? No, the record's not clear on that, but I think that what is important here is that we cannot show, via page 437 of Minnesota v. Murphy, a similar assurance by the government that they would never revoke somebody for not responding to a question and not satisfying the probation requirement that you respond because this officer, Officer Smith, has in fact revoked people. So I think that's the piece of the puzzle that's important, Judge. Thank you. Thank you. Okay. Well, thank you. Thank you, Mr. Tillis. Thank you, Mr. Temkin. Case will be taken under advisement.